10-1039 Shing v. Sunbeam & Cemental Techs Mr. Dunnigan May it please the court, my name is Bill Dunnigan. I represent the appellate Wing Shing, which is the design patent owner. The issue that brings us here today is whether or not the district court erred in granting summary judgment to the defendant, Sunbeam, on the ground that its accused products were too different than the design patent as a matter of law to sustain an infringement verdict. Review is therefore de novo. I'd like to make three points. First, I'd like to suggest the holding in Seaway from December of last year should compel a reversal in this case. Second, I'd like to suggest that the application of the standard for design patent infringement should compel a reversal in this case. And finally, I'd like to suggest that the opinion of our expert on design should compel a reversal in this case for a trial on the issue of infringement. Now, starting at the beginning, the opinion in Seaway from last year shows a depiction of, on page 14 of the slip opinion, shows a depiction of the patented design and a piece of prior art. The court expressly found in that case that there was a genuine issue of material fact as to whether or not the item of prior art, specifically we're dealing with the insoles in these clog-like shoes, was sufficiently close to anticipate. The test for anticipation being the mirror image of the test for infringement, the court should find that if it was close enough in this case to present a question of fact, then it should be close enough in our case to present a question of fact. Specifically in our case, there's three different infringing products. There's what I call the AR Converted, the AR-4, and the AR-12. Let's deal briefly with the AR Converted, because I believe that's closest. To come up with the AR Converted, all the defendant did was take a prior infringing product, infringing as a result of a prior litigation between the parties, which was affirmed by this court, and put a different lid on the reservoir cover. That is an extraordinarily slight change, and I would suggest to you that it is dramatically less than what the court referred to as a distinctively different design in the Seaway case. With respect to the AR-4, the defendants changed the base of the device only, except for some very, very trivial changes in the body. I would again suggest to you that those changes in the base of the infringing product, the AR-4 only, are not enough to take this case away from what is compelled by the holding in Seaway. When you put the top and the bottom together, I'm not going to tell you that that's an easy case to decide whether or not that is within what's shown on page 14 of the slip opinion in the Seagate case. But I think you could easily find that there's a question of fact on that issue based upon the general principles here, and specifically if we get to our second point, which is the application of the design infringement test. Now, focusing on the test for design patent infringement, I think you can very easily find that there's a question of fact with respect to each of the three products which are the subject of the case. The first step we go through is we ask, in the abstract, you hold up the design patent, you hold up the infringing product, and can you say, just as a matter of common sense, these are so different that no reasonable, ordinary consumer could possibly confuse them. And the answer is, in this case, you can't say that. Is that so different test under Egyptian goddess? What is the ordinary observer test under Egyptian goddess? Is there a degree of deception that has to be taken into account? I think the Egyptian goddess test is the same as the Gorham v. White Supreme Court test, except with the little twist that you clarified under Egyptian goddess, that the reasonably or the ordinary prudent purchaser would be familiar with the prior art. So would they buy one assuming that it's, would they buy one concluding it's the other? Well, that's a question of deception. Is it misleading the consumer by having them or her think that it's the patented product rather than somebody else's product? Your Honor, when you say deception, I understand to mean deception to mean something of a state of mind which is questionable or malevolent. Misleading. Misleading, yes. So that you would be misleading someone into buying one product thinking it was another? Yes. It's almost like a trade dress type of analysis, isn't it? Yeah, a trade dress trademark. It comes very close to a trade dress analysis. Yes, Your Honor. So if I buy one product thinking it's another, then I've been misled into purchasing one over the other. That's the overall test. That's the square overall test. And the key here is that we're dealing with a coffee maker, which is certainly at Sunbeam's largest selling coffee maker ever. It may be the largest selling coffee maker in the world. That's what we have a design patent on. And they come along and one, they tweak. They put the lip on top and then they change the bullnose. And on one, the only change they made was to change the top. On one, the only change they made was to change the bullnose. And on the third, they changed them both. But if that would be sufficient so that a purchaser would not buy one thinking it was the other, would that be sufficient? Even though it's a small change, according to you? Yes. Yes. But the key to understanding this is that who should decide whether or not that change is going to fool the ordinary purchaser. Should it be a judge merely looking at one design, the prior art, and the accused design? Or should it be a jury hearing testimony about who's actually going to be purchasing these products? Under what circumstances are they going to be purchased? What's the level of care that a purchaser is going to give to these products? Now, here we're dealing with a very inexpensive, it's called a traffic builder coffee maker. These things are cheap. Now, that suggests the amount of care is going to be very low. That's what our expert stated. Now, just because the price is low doesn't necessarily mean there's going to be a small amount of care involved. Cell phones, for example. Have you ever seen a teenager pick out a cell phone? There's a lot of care that goes into that decision. I don't think coffee makers are like that. I think coffee makers, you just pick one out. If the color is right, they'll pick it out. You know, it's not something I think most consumers spend a lot of time on. But the way to figure out whether or not the actual purchaser is going to be deceived is to have a trial on the issue and let the jury consider all the facts and circumstances. But isn't your argument going to lead to the conclusion there can never be summary judgment? No, Your Honor. No, Your Honor. Because where I'm drawing the line is you can have summary judgment in situations in which the accused product is closer to the prior art than it is to the design package. What we have in this case, which makes it rather unusual, is the district court virtually admitted, and Sunbeam does not challenge, that the accused products in this case, or at least a reasonable jury could so find, are closer to the design patent than they are to the accused products. Now, I agree with you. You can't have a rule of law which says you can never get summary judgment because the problem you'd run into in that instance is a jury might find that an accused product is confusingly similar, and it may be on the other side of the prior art from the design patent. It may be accused product here, prior art here, design patent here. We can't have that. But in the situation we're dealing with here, in which I think everyone is going to agree that at least a reasonable person can find that the accused product is closer to the design patent than it is the prior art, then the problem that Your Honor is concerned about is not going to arise, at least if that rule is applied in this case. You're into your rebuttal now. Shall we hear from Mr. Fleming? Good morning, Your Honors. May it please the court. My name is Thomas Fleming, representing Sunbeam Products. Judge Garza, to answer your question, the standard is, whether the ordinary observer with an eye toward the prior art on the Egyptian goddess would be deceived to believe that the accused design is the same as the patented design. Now, what you haven't heard from the appellant is that the trial judge adopted and applied an erroneous claim construction, or that the trial judge adopted and applied an erroneous legal standard. In fact, I can't argue that because it didn't occur. What you're hearing, Your Honors, is that they want you to apply a legal standard that exists nowhere in Egyptian goddess to overcome the summary judgment finding. And in fact, what they argue is that no trial court could decide summary judgment of a design patent because all their decisions, and there have been numerous of them, Your Honors, since Egyptian goddess has come out, are all ad hoc in the words of the appellant. The esoteric standard that the appellant is advancing never appeared in the judge's decision. In fact, what the judge said is, appellant argues that the accused device is closer to the patented design than the prior art, and the court finds that unpersuasive. And then it went on to say that not only that, but that's not our consideration because this court started with, we will look at the drawings and that will be our claim construction. It then said, as Egyptian goddess taught, we looked at these two devices, the design patent and the accused device, and we find them to be sufficiently distinct, so that as a matter of law, without even consideration of the prior art, which Egyptian goddess said they could do, the differences were such that no reasonable juror could infer similarity. Would you state then that the judge is a person of ordinary skill in the art or the ordinary observer? Your Honor, the judge... Summary judgment. For summary judgment, the judge is tasked to look at these devices through the eyes of a hypothetical ordinary observer, and that's the words of Egyptian goddess. The hypothetical ordinary observer is one who, the ordinary observer, to answer your question before, is one who regularly purchases designs, devices of these type, and has an eye to the prior art. So the judge first said, in looking and adopting that hypothetical person's visage and perception, I find them, in the judge's words, not only sufficiently distinct, but he said manifestly distinct. So the judge places himself in that hypothetical situation. He has to, Your Honor, because that's the legal standard the court imposed upon him to analyze. Would that be sufficient to state, if they had submitted as part of their evidence a summary judgment, a survey showing that 500 consumers, 250 or 400 of which had purchased this item thinking it was a patented item and 100 did not, would that be sufficient to overcome that? Your Honor, you raise a very interesting question because another basis for the trial court's grant of summary judgment to some being was the deficiency in the evidence that was presented by the appellant to the court. Mine was a hypothetical question. So the hypothetical question is, Your Honor, that I'm sure a survey might be instructive depending upon its construct, and there are all sorts of validation requirements and qualification requirements that attend survey evidence, as the court knows from the trade dress cases. So assuming all of those qualifications are met and there's a sufficiency of authentication and appropriateness from the trial court, that type of information could be important. But the trial court didn't stop at sufficient distinctness. It said, I find that as a matter of law. But I think looking at the prior art, as Egyptian goddess instructed, is also going to be helpful, and it's helpful for three particular reasons. The first thing the court said was, as you look at a prior art, it will inform the ordinary observer's view of the accused device and the patented device. What that means is it will look to how the prior art is different from the patented art, and those differences, because we're talking about ornamental designs and visual impressions, those differences will leave the eye of the ordinary observer as it compares the accused device and the patented device. And also what it said in terms of the prior art is a crowded art field, where it's not disputed, this is a very crowded art field, Your Honor, does two things. One is it makes certain what might otherwise be small differences significant to the observer. And two, what it does is it limits the scope of the application of the design patent. All of those factors attend here, because, Your Honors, we submit that the differences between the accused device and the patented design are incredibly significant. If you look just at the design of the base, which the court accepted was among the more dominant features that the casual observer would see as it looks at these devices, that is significantly and totally different. If you look at the top, the top is in itself, in the words of the trial judge, a dramatically different change. Totally different going from a shaped bullnose to a diagonal bullnose? It's sloping off, Your Honor. Sloping off? Yes, for three particular reasons. Is there any evidence to that effect that it is a significant difference? Well, there is evidence submitted in the declarations of the designers that was submitted below and not contested. There is also the evidence of the defendant's expert, who is an expert in designing coffee makers, and talked about the fact that when you have the plate, the hot plate, and it sat in the design patent on a flat surface, now what you have is the hot plate and everything is sloping downwards. So that what you see is a very different elevation in the side angle. What you also saw were changes in the design of the grooving around the towers. And what you see now also, if you look at 826, which is the judge's decision, where he did a comparison of the prior art, the patented design, and the accused product, what you see is there's a button on off switch on the base plate, which doesn't exist in the patented design. Then you add to that, the trial court said, this dramatic difference in the cover. In the patented design, it's a flat cover. In the accused device, you have a cover that has an indenture, which is overlaid with a lid, so that there's actual separation space. But where in the patent design, you have just pure flat. Was that a specific designer on the patent? Yes, Your Honor. Because remember, and let's put this all into context, there was what was presented in the briefs as called Wing Ching 1, which was a lawsuit with this patent against a different product. And they went to judgment. In that prior lawsuit, and this is not disputed or even argued in appellant's briefs, this currently accused product was presented to the court as a non-infringing substitute. The court said, this is a substantial redesign. And the court actually said, it is a viable and acceptable non-infringing substitute. That was never challenged. And that decision went final. Several years later, after having collected money in that first lawsuit, in 2006, this lawsuit's created now where that product is accused of infringing the patent. So certainly we argue that it's dispositive for multiple reasons, starting with the fact that they were stopped from arguing if the device infringes, because in a prior litigation in which they were successful, it was acknowledged by yet another court to be a non-infringing substitute to the patented design. Secondly, this court said, following Egyptian goddess to the letter, as you court instructed it to, just looking at them without taking into consideration the prior art, they're sufficiently distinct. Then what it said is, and when I look at the prior art, it's even more compelling because you have a very crowded art field. And I looked at what made the patent design different from the prior art, which is some beings own prior art, because they are the pioneers in this particular area of design, was the very nose, Judge Gay-Arsa, that you pointed out there. So when, and what Egyptian goddess tells you, is what will the ordinary observer look to? It'll look to just those features, that the patented design differs from the prior art, to see if the accused product is yet even different still. And in this case, Judge Howell found, and it was almost undisputed that they were. Now, Appellant wants to talk about their expert report, but the expert report is not a prohibition to summary judgment. It wasn't in many of the cases presented into lower courts like HRUS. It certainly wasn't in Egyptian goddess. And it wasn't necessarily a prohibition in the court's recent decision of Richardson versus Stanley Works. Particularly, this expert report wasn't, because the trial court found, it didn't even address the significant aspects, the salient aspects in the words of the trial court, of the base and the lid. And therefore, the court found it of limited probative value. And as to these other devices, the A5 and the AR2004, the court said there was no evidence presented below, or in the motion, or in opposition to the motion. So, your honors, unless you have specific questions, I'll rest to balance my argument on the briefs, and I thank you. Thank you. Mr. Dornigan. I think we should talk for a moment about what the district court, in fact, did, in reasoning that there was no infringement. The crux of the district court's reasoning is that the focal point of the product is going to be the top of the base, and I'm looking at A23 of the record. The district court says, as Sunbeam points out, these differences, meaning the top and the base, come at focal points in the design. The top and the base are the most visually commanding features of a coffee maker, along, perhaps, with the brew basket. And it cites Sunbeam's brief. Now, is there any evidence in the record which supports that conclusion, or that finding of the district court, which is so critical to its conclusion? And the answer is no. There are two parts on which Sunbeam relies to get to that point. The first is, in A265, we have the opinion of a witness at Sunbeam who was involved in design, but who never submitted an expert report, except in the declaration in opposition to summary judgment. He never submitted a report, just a declaration containing his conclusions, that these are the focal points. Because that's an issue which really should be the subject of only expert and not lay testimony. I think that that should be ignored. But counsel, the only difference between the prior art and the 585 patent are these exact focal points. So why isn't the district court perfectly reasonable to rely on the fact that the top and the base are all that distinguishes the prior art from the 585 patent, so that that's what ought to be focused on in the accused device? I don't think it's factually correct that only the top and the base are the difference between the prior art. There's the Excel on one hand, and the design patent on the other. The Excel has a much more limited enclosure for the back of the carafe than does the design patent. The design patent hugs the carafe to a greater degree. Yes, and the angles of the back to the front, to the brew basket, are slightly different. To that extent, the accused device is more like the prior art. So it becomes difficult for you to make this argument. Sure, I'm looking at the pictures. The accused device doesn't come all the way around like the 585 patent does? No, yes it does, Your Honor, because the testimony in the record is they built their accused product by using the same molds that they had used for the body of their infringing AD product. The photographs you're looking at may be deceptive, but the molds that were used were the identical molds to the infringing molds. The only difference between the embodiment of our AD product as it was a physical product found to infringe and their AR product as it was presented to the court was the bottom and the top. Everything else, the middle section, the hat was different, the shoes were different, but everything else was the same. No, it doesn't mean it was the same. The fact that it was found to infringe doesn't mean it was identical. It means the ordinary observer overall looked at it and didn't see big differences. It doesn't mean it was identical. Well, it was held to be infringing, and it was... The fact that it was... I agree. I agree. I see your point. I'm looking... You want us to find problems with the district court's analysis focusing on the top and bottom, but look, I'm looking at these three pictures and I have to say that's the only thing I'm focusing on. My eye is not drawn to any other distinctions. But you don't have the products in front of you. You have photographs of it. The photographs made... Comparing a design patent to a photograph is going to create distortion. What's patented? The thing itself or the image that you submit? What is claimed is the drawing. The only thing you have a patent on is this picture, so I don't need to see your commercial embodiment in order to try and figure out infringement. In fact, that would be inappropriate. I hear that, and I think that's right. But I think if you're... I don't know if there's any case addressing this, but if you're sitting on the jury, I think what you have to do is you have to look at that drawing in pencil and say, what does that really represent in terms of a real object? Because if anyone tries to compare a drawing to an object, well, one's a drawing, one's an object. I mean, they look different. The ordinary purchaser is going to have to move from the stick drawing to the object through a mental process of turning the stick drawing into an actual product. And I think once you do that, then you're at the point where the difference between the product, except for the base and except for the top, is going to be substantially the same, meaning any other difference in there is going to be trivial. All right. Thank you. Thank you.